UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE
_____
                                                    )
FATHER DOE and MOTHER DOE,                          )
     as parents and next friends of JOHN DOE[1],   )
                                                    )
          Plaintiffs                )
                                                    )
v.                                                  )
                                                    )
PHILLIPS EXETER ACADEMY,                            )
                                                    )
          Defendant.                )
_____ )

## COMPLAINT AND JURY DEMAND

## INTRODUCTION

1.     This case arises out of Exeter's intention to refuse to allow John Doe ("John") to return to school on September 7, 2016 for his second year in high school in violation of its contractual, statutory and common law obligations.

2.     In January 2016, John, age 15, and Jane Doe ("Jane"), age 15, engaged in sexual activity with one another.  In March 2016, Exeter notified Plaintiffs that Exeter intended to impose a temporary "Dean's Leave" for "one semester" but that John could return in the fall. Written notice followed in which Exeter acknowledged that Plaintiffs were expecting for John to "return to Exeter and pick up with his Lower (10th grade) year."  The letter imposed conditions for the leave, including that John seek therapy and that John, his Parents, and the therapist make written submissions to the school by June 1.  Exeter did not require John to enroll in school for the spring term.  John and his parents understood and expected, from the terms of the letter and

---

[1] John Doe is a minor, and as a result, Plaintiffs have filed a motion to proceed in this case under pseudonyms. Consistent with that request, the female student with whom John Doe engaged in sexual activity will be referred to as Jane Doe.

oral representations made to them, that the deans would review John's compliance with the conditions in determining the terms of his return to Exeter.

3.      Instead, and although Exeter has never complained that John did not meet the conditions of his leave (he did), Exeter seeks to separate John permanently from the school.  By the end of June, Plaintiffs were told John was going to be given a permanent Dean's Leave, something the student handbook does not contemplate or permit.  Plaintiffs complained to the Principal that John was being treated unfairly.  Thereafter, on August 16, 2016, Principal Lisa MacFarlane notified Plaintiffs that if John was not voluntarily withdrawn immediately, the school would withdraw him involuntarily for "sexual harassment" of Jane.  In effect, Exeter seeks to impose the maximum disciplinary sanction its handbook permits, a "Requirement to Withdraw", for the very same conduct for which it had already given John a Dean's Leave with conditions.

4.      In cases where Exeter believes a "Requirement to Withdraw" might be possible, the student handbook requires that Exeter notify the student of the charge in advance of an investigation (it never did), give the student a chance to respond in writing to the allegations (it did not), form a Discipline Committee (it did not), and hold a hearing where evidence is presented and considered by the Discipline Committee (none was held).  Instead, Exeter intends to impose a second, maximum punishment for "sexual harassment" based on an investigative report which Exeter has repeatedly _refused_ to give to John's parents, and for conduct for which it already subjected John to a Dean's Leave.  This after _John_ notified Exeter of his own concerns that, in fact, it was Jane who pursued _him_, that she was the one to initiate sexual contact with him without first obtaining his consent, and that he felt pressured by her.  This is in breach of contract.

2

5.     Importantly here, as late as May 26, 2016, Dean Gordon Coole told Plaintiffs that the deans were all looking forward to John's return, but a month later, by late June, Dean Michelle Mischke was telling Plaintiffs John would be placed on a permanent Dean's Leave. This left Plaintiffs wondering what could have changed.

6.     The day after Plaintiffs met with Principal MacFarlane at Exeter to state their serious concerns about how John was being treated, *The Boston Globe*'s Spotlight team ran a story on July 13, 2016 that was critical of Exeter's handling of a different situation where a female student made a complaint of sexual harassment by a male student.  A day later, *The Boston Globe* published a second story reporting that alumni were threatening to withhold financial support from the school for its mishandling of a female student's complaint about sexual misconduct.  Plaintiffs have serious concerns that Exeter is reacting to this negative publicity and it is clouding the school's judgment and resulting in unfair treatment of their son.

7.     Plaintiffs seek immediate preliminary and permanent injunctive relief to prevent Exeter from withdrawing John from school and to preserve his status as an enrolled student. Indeed, Exeter should not be allowed to punish John a second time for the very same behavior. John served his Dean's Leave and met all conditions, and no further discipline should be permitted of any kind consistent with Exeter's promises, the parties' agreements, and John and Plaintiffs' reasonable expectations.  Exeter's conduct, if unchecked, is likely to derail John's high school career during some of his most formative years, while Plaintiffs continue to remain largely in the dark about Jane's allegations and the basis for Exeter's decision because Exeter has never shared the investigation report with Plaintiffs or John.  Exeter's conduct should not be condoned by this Court.

4826-5507-1798, v. 1

## ii.     Jurisdiction

8.      This action arises out of Exeter's breach of its contractual and other obligations to John, as well as its violations of Title IX of the Education Amendments of 1972 (10 U.S.C. § 1681), applicable to Exeter because, on information and belief, it receives federal funding.

9.      John is a minor and the plaintiffs, his parents, guardians and next friends, have filed suit on his behalf. John and his parents are not residents of New Hampshire. Exeter is a New Hampshire non-profit organization. The amount in controversy is over $75,000.

10.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.

11.     Venue is proper under 28 U.S.C. § 1391(b).

## iii.     Parties

12.     Father Doe and Mother Doe (the "Parents" or "Plaintiffs") are not residents of New Hampshire, but reside in another state. Their son, John Doe ("John"), is a minor, age 15 years, and was at all relevant times enrolled at Phillips Exeter Academy in Exeter, New Hampshire. Plaintiffs bring this action on behalf of their minor son.

13.     Phillips Exeter Academy ("Exeter") is a non-profit, coeducational private school for boarding and day students in grades nine through twelve. Exeter is located at 20 Main Street in Exeter, New Hampshire, and is registered with the State of New Hampshire as a domestic non-profit corporation. At all relevant times, John was enrolled at Exeter as a freshman, boarding student. Jane was also a freshman, boarding student at Exeter. Both John and Jane were 15 years old at the time of the events at issue.

## iv.     Facts

14.     Exeter is a highly regarded and exclusive private school. John Doe and his parents began to work to seek John's admission to the school a year in advance of his freshman

year.  The acceptance rate is typically around 12-16% of applicants to fill an incoming freshman class.

15.     After much time, work and expense towards completing the application process and meeting Exeter's rigorous standards for applicants, John was accepted for admission as a first year/freshman boarding student in the fall of 2015.  John has long been a committed and studious young person and was eager to avail himself of the opportunity provided by attending Exeter and immersing himself in the rigorous academic programs the school offers.

16.     Exeter's academic year is divided into three terms: fall, winter and spring.  In the fall and winter terms, John performed quite well academically.  In addition John participated in various social activities, including playing football and basketball for the school.

### John Doe's Interaction With Jane Doe

17.     After return from the Christmas break in January 2016, John and some of his male friends attended a dance near Exeter that was hosted by a club affiliated with Deerfield Academy.  Jane was also at the dance with some of her friends.

18.     During the dance, Jane flirted with and pursued John, dancing very closely and suggestively with him.  Late in the evening, John's friends had all left and Jane asked John if he wanted to go back to his dorm room with her.  He put off the question.  Jane asked a second time, and again, John put her off not wanting to engage in physical sexual activity with Jane but feeling pressured by her to do so.

19.     Instead, John took Jane back to the Amen Hall common room where his friends were.  Jane and John socialized with this group of friends in the common room until late into the evening.  By around 11 p.m., John went back to his own dorm room for the night.

20.     In the morning the following day, a Sunday in January, John received a snapchat—a type of text message—from Jane on his iPhone.  Jane asked John if he wanted to "hang out" in John's dorm.  John agreed she could come over, and he met her at the entrance to his dormitory.

21.     When Jane arrived, John explained that his dorm mates were in his room but they could go into an empty, single room of a friend of his on the first floor for privacy.  Jane agreed and accompanied John into the private room.

22.     John was still tired from the prior evening, and after the television in the room was turned on, he fell asleep on his friend's bed.  He woke to Jane lying next to him, with her body close to his.  She was kissing his face and touching him in a sexual manner.

23.     The two continued to "make out"—kissing one another.  Jane removed all of her clothes herself and assisted in removing John's clothes.  The two engaged in sexual acts which they simultaneously performed on one another, finally engaging briefly in vaginal intercourse.  Jane ended the intercourse by getting off of John.  They both saw a little blood, which, as neither of them had engaged in vaginal intercourse before, neither understood.  Both students dressed themselves, said their good-byes, and left the room together.

24.     John communicated with Jane subsequently about what he learned from a trusted friend about the source of the blood (likely a ruptured hymen).  John learned that Jane was relieved.  Neither of them indicated a desire to continue any intimate contact, and neither of them pursued further intimate contact with the other.

25.     Although John was unaware at the time, Jane asked one of her best friends to find out whether she had been "good" at performing sexual acts on John.  A true and correct copy of a

6

text communication informing Exeter of Jane's communications in this regard, sent prior to Exeter's decision to require withdrawal of John from school, is attached hereto as Exhibit __.

26.     In February 2016, John learned from a mutual friend of Jane and John that Jane had had some sort of breakdown, unrelated to him, and gone to the on campus health center to speak with someone.  This student reported to John that Jane had told "everything" about her interaction with John.

27.     Shortly thereafter, at the end of John's English class, Dean Gordon Coole appeared and asked John to come with him.  No explanation was given.  John went to an office where Dean Mischke and John's residential counselor, English teacher Alex Myers, were waiting.  A Dean asked John if he knew what this was about, and since he had just learned Jane had been to the health center and spoken of their interaction, he asked if it was about Jane Doe. He was told it was.  John then began by saying to them that the interaction was entirely consensual, and everyone agreed that was consistent with what they had heard from Jane as well.

28.     At this time, as Mr. Myers knew if the others did not, Father Doe had been diagnosed with cancer years prior and was then suffering from a serious medical issue.

29.     Father Doe was contacted by Dean Mischke on Monday, February 22, while Father Doe was in the hospital preparing for surgery relating to his ongoing medical issues.  John and Dean Mischke were together in the Dean's office for the call to Father Doe.  Dean Mischke informed Father Doe that the school had had a report that John and another 15-year old student had engaged in consensual sex.  Father Doe understood from the call that Exeter considered consensual sex between students of this age to be a violation of a rule.  Father Doe informed Dean Mischke that he was hospitalized for pneumonia, and on information and belief, Mr. Myers

7

4826-5507-1798, v. 1

also knew that Father Doe had been undergoing treatment for his diagnosis of cancer and was experiencing a serious medical issue.

30.     Two days later, on Wednesday, February 24, Father Doe was with his wife, Mother Doe, in the hospital preparing for surgery that day. He was heavily medicated. Dean Mischke called Father Doe in the hospital to say that she had met with Jane's parents, and the situation was "more challenging" than she had first thought. Dean Mischke asked Father Doe to allow John to be interviewed by the school's independent investigator. Father Doe continued to believe the school was looking at a situation where both students had broken some rule about engaging in sex on campus; Dean Mischke gave Father Doe no information to the contrary and she did not disclose what Jane's allegations were or what school rules Exeter believed may have been broken by either student. Father Doe spoke to John and agreed John could be interviewed if accompanied by Mr. Myers.

31.     At this time, Mother Doe was completely in the dark. She was supporting her husband in the hospital and had no knowledge of anything that was happening.

32.     Father Doe should not have been asked to give consent to an interview of his son by Dean Mischke given she knew he was hospitalized for a serious medical issue, and given that at least Mr. Myers knew of Father Doe's cancer diagnosis. In fact, the medication that Father Doe had taken likely impaired his ability to give effective consent to the interview.

33.     In any case, without being given any information about what made the situation "more challenging", and with absolutely no prior notice of what Jane was alleging had occurred or what rule violations Exeter was investigating (other than consensual sex between minors), Father Doe did agree John could be interviewed.

8

34.     Around the same time of the telephone call to Father Doe to seek consent to the interview, Dean Mischke sent an email to Father Doe and Mother Doe, which neither of them received at the time because of Father Doe's hospitalization and preparation for imminent surgery.  The email stated it was "important th[at] we conduct an investigation into what happened between [John and Jane] back in January.  There are concerns that the situation was more challenging than is being portrayed.  I say this after speaking with [Jane's] parents on Monday afternoon, following our phone call."  Just as in her telephone call to Father Doe in the hospital, the email from Dean Mischke did not say what was "more challenging" or why the school felt a need to conduct an investigation.  This email was not read by Father Doe or Mother Doe until Friday, February 26.  A true and correct copy of this email is attached at <u>Exhibit A</u>.[2]

35.     Later that day, February 24, 2016, Father Doe had surgery out of state.  Father Doe had another surgical procedure on Thursday, February 25.

36.     John was interviewed on Friday, February 26 by Exeter's outside investigator.  Before the interview, John met with Mr. Myers who told John that he did not have to answer the questions if he did not wish to do so.  Mr. Myers attended the interview with John.  John was intimidated by the investigator, who asked leading questions John felt were unfair and designed to get him to confirm only certain facts.

37.     At one point John declined to answer a question the investigator asked him, and the investigator laughed at John and told him that he had to answer all of her questions.  John said Mr. Myers had told him he did not have to answer, but the investigator (with Mr. Myers present) pressed John for an answer, and the 15-year old minor gave in and answered.

---

[2] References to students' real names, and to the Parents' real names, have been redacted to protect the privacy of the minors involved.

38.     As John was being interrogated, he typed over and over into his iPhone the words "I'm scared" and tried to confidentially show the message to Mr. Myers—a cry for help. Mr. Myers did nothing to intervene on John's behalf.

39.     After the interview, Exeter had arranged for a counselor to meet with John in the student health center. John told the counselor he had been intimidated and afraid of the investigator and that John felt the investigator was not interested in the truth. John told his parents, the on campus counselor, and Mr. Myers that he had been scared and intimidated during the interview and that the investigator had made him answer a question he did not want to answer after laughing at John and telling John he had to answer all questions. Mr. Myers said nothing during the interview, according to John.

40.     On Thursday, March 3, Father Doe was released from the hospital.

41.     Also by that date, Exeter apparently had received at least an oral report from the investigator. Dean Mischke emailed only Father Doe to ask for a telephone call to review the "general findings" of the investigation "as well as next steps." Dean Mischke stated in her email that the investigator found it "a challenge to find her bearings in this case given the level of confusion these young kids have about sex and the situation the[y] found themselves in. I don't want to be cagey about the conclusion so I will just say up front that Ms. McGintee, while she has concerns about [John], the attitude and his lack of reading the situation[,] as well as not obtaining expressed consent early on, concludes no malice and no forcible action. Rather it was a confusing situation for young kids who had never had sex before and [] neither communicated well what they wanted to do or not do." A true and correct copy of this email is attached at Exhibit B.

42. On information and belief, by March 3, 2016, Exeter had a written report from the investigator. That report was _never_ given to John or his parents in spite of their express requests for it.

43. The spring break leave, between the winter and spring terms, was scheduled to begin on Monday, March 7, 2016. After John returned home for break, John's parents spoke with Dean Mischke by telephone about the investigator's findings.

44. In this telephone call, Dean Mischke reiterated what she had said in her initial email about the investigator's findings, but for the first time she stated that Jane claimed she felt pressured to agree to sexual contact with John. Dean Mischke said Exeter felt a Dean's Leave "just for a semester" was the appropriate response. Dean Mischke said John would be able to return in the fall and a letter confirming this would come from the Dean's office and would specify the conditions of his leave.

45. After John was informed about this conversation, he wrote an email to dispute the allegation that he had pressured Jane to engage in sexual activity. This was sent to Dean Mischke on Tuesday, March 8 from his Exeter email account. Although Plaintiffs saw this email at the time, John no longer has access to his Exeter email account and cannot access this sent email.

46. Father Doe asked to speak with Dean Miscke further on Tuesday, March 8. Dean Mischke put him off, saying she was on break and could speak with him after she returned on March 18. Dean Mischke also expressed frustration that John was providing information late in the process, referring to John's March 8 email in which he set out, in some detail, the interaction between himself and Jane. A true and correct copy of Dean Mischke's March 8 email is attached as Exhibit C.

4826-5507-1798, v. 1

47.     After being informed of Dean Mischke's response to his first email, John then sent a second email to Dean Mischke on or around March 9, 2016 to explain why he had sent his March 8 email. John stated in this second email to Dean Mischke he was providing more detail now because he had "just learned yesterday what I am being accused of." *Id.* A true and correct copy of the body of this second email to Dean Mischke, which John copied and sent to his father before his access to his Exeter email account was suspended, is **attached to the Affidavit of Father Doe as <u>Exhibit A</u>.**

48.     John also stated in his second email to Dean Mischke that he did not go into a high level of detail concerning his sexual activity with Jane because "at the time, you told me that your view was that everything was consensual. I didn't feel this extra detailed information that proved even more that it was consensual was necessary." *See id.*

49.     Exeter's failure to be forthcoming with John and his parents about what was being alleged and what disciplinary infraction the school was investigating tainted the entire process. John and his parents, told that two kids had engaged in consensual sex, had no idea that Exeter believed or was investigating whether any sexual misconduct on the part of John had occurred. The failure to give proper notice of the allegations to Plaintiffs and John impacted Father Doe's ability to give effective consent to John's interview; it tainted John's mindset during the interview (as his email stated); and it tainted the entire (highly defective) "process". This combined with the fact the investigator asked closed/leading questions and never asked John simply to describe, in his own words, the interaction from start to finish, resulted in an investigation that was incomplete, biased, and unfair.

50.     On March 18, when Dean Mischke had returned to campus from her break, she telephoned Plaintiffs. Then, for the first time, she informed Plaintiffs of a second claim Jane had

made, namely, that she had not consented to one sexual act. After John learned of this new allegation, he emailed Dean Mischke again, stating he had never been given an opportunity to respond to this accusation because he was never informed of it before. John explained why the interaction was consensual, including that Jane voluntarily removed her clothes, assisted in removing John's clothes, and was simultaneously performing a sexual act on him while he performed the act she was now claiming had been nonconsensual. A true and correct copy of the body of this email to Dean Mischke, which John copied from his Exeter account and sent to his father before his Exeter email account was suspended, **is attached to Father Doe's Declaration as Exhibit B**.

51.      John expressly stated in this email to Dean Mischke that Jane was the aggressor in the situation, not he. He stated his belief that if there was any misconduct, it was unfair that he stood accused of it and not her. *See id.*

52.      This put Exeter on notice that, in fact, it was *John* who felt pressured by *Jane* to engage in sexual contact, starting from her pursuit of him and request that they go to a private room together the prior evening, and that *she* had initiated several sexual acts without requesting or obtaining John's consent.

53.      Informed that the male student was claiming that he was pressured by the female student to engage in sexual conduct, and aware that the male student was claiming the female student did not seek or obtain consent to certain sexual acts, nonetheless Exeter *never* investigated or considered disciplinary action for Jane. On information and belief, Exeter failed to consider Jane's conduct as harassing or a violation of policy based on gender stereotypes and biases, namely, that boys always consent to or want sexual contact and do not fall victim to pressure from girls to engage in unwanted sexual contact.

54.     In spite of the emails from John, supplied in response to information given by Dean Mischke to John and his parents in dribs and drabs about just some of Jane's accusations, Exeter stood by its decision to discipline John with a Dean's Leave for one term.  Dean Mischke sent John's parents the Dean's Leave letter, as she indicated she would, which explained the conditions of the leave.  A true and correct copy of the letter is attached hereto as <u>Exhibit D</u>.  The conditions identified in the Dean's Leave letter included that John work during the leave to "reflect upon this situation, learn from it and move forward", that John "work with a psychologist or clinical social worker for weekly consultations" to obtain "educational guidance or instruction on sexual health matters, including building health relationships…."  John's parents were told John "could move up a level next fall" even though Exeter did not expect John to be enrolled in school during the spring term.  *Id.*

55.     The letter indicated the Deans would review John's compliance with the conditions to determine whether he could return in the fall, *id.*, but of course, Dean Mischke had already told John's parents that the leave would be for "one semester only" and that he could return in the fall.  The Dean's Leave letter requested that John and his parents submit a written report about his time on leave and his "ability to be a trusted member of the Exeter community", further asking John's "clinician" to "write a summary report" as well.  *Id.*  The clear implication was that Exeter would review John's compliance with the conditions of his leave as the sole basis to determine whether or not he could return in the fall.  Dean Mischke had stated her expectation John would be able to comply and return when she had told his parents the leave would be for one term and he would be back.

56.     John and his parents arranged for him to meet the conditions of the Dean's Leave. On May 26, Dean Coole reached out to Father Doe to follow up on the submissions required as

conditions of the Dean's Leave. Dean Coole said to Father Doe that the deans were looking forward to John's return to school, and that they would be meeting the following week and could approve his submissions at that time. The required submissions were all delivered to Exeter by May 31, 2016, consistent with Dean Coole's request and the Dean's Leave letter.

57.     On May 31, 2016, Dean Mischke indicated she would respond in a week concerning John's compliance with the conditions of his Dean's Leave.

58.     By June 20, 2016, John's family had heard nothing from Exeter. Father Doe reached out to Dean Mischke by telephone to inquire of the status of review of the submissions the family had made to show John's compliance with the conditions of the Dean's Leave.

59.     On Wednesday, June 22, 2016, Dean Mischke telephoned Father Doe. Although she never raised any issue with John's compliance with the conditions of the Dean's Leave, she said that Exeter was going to place John on a "permanent Dean's Leave". Plaintiffs were stunned.

60.     John's parents telephoned Exeter to seek a meeting with Principal MacFarlane. After some delay, they were able to arrange a meeting with Principal MacFarlane, who did not want to meet with them without Dean Mischke present. The meeting took place in Principal MacFarlane's office at Exeter on July 12, 2016.

61.     During the meeting, it became apparent that Principal MacFarlane did not understand the underlying facts of the situation, was unfamiliar with the investigator's report, and was relying on Dean Mischke to investigate the matter and determine applicable discipline. John's parents stated their serious concern that John was interviewed, and Dean Mischke decided to discipline John with a Dean's Leave, all before John or his parents were given any information about what Jane alleged or what alleged rule violations the school was investigating. Not until

15

March 18, long after John's interview and after Dean Mischke reported the results of the investigation to John's parents, did Dean Mischke say for the first time that there was some allegation that a sexual act had been nonconsensual.

62.     Dean Mischke stated that Exeter was relying entirely on the findings of the investigator set out in the investigation report. John's parents said they had never seen the report and asked for a copy of it. Principal MacFarlane asked Dean Mischke to get a copy and provide it to John's parents. Dean Mischke left the room and returned with the report, but she said that it was a private school document and should not be given to them. She then appeared to read selectively from the report, but neither Principal MacFarlane nor Dean Mischke gave it to Plaintiffs to read. No one allowed Plaintiffs to have a copy of the report. They have never been given a copy or an opportunity even to read it.

63.     During the meeting, Dean Mischke acknowledged certain consistencies in the students' interviews, including their report that they both had removed their clothes.

64.     By this time, other Exeter students had heard about what was happening and several of them had told John they believed Jane was lying. Two of Jane's female friends reported to John that they had gone to the dean's office to report how Jane had described her interaction with John at the time. One of these students had told John that Dean Mischke had acknowledged that Jane's version of events had "evolved over time".

65.     When Plaintiffs brought this up at the meeting on July 12, Dean Mischke denied that she had discussed the matter with other students, in contradiction to what John had heard from these students directly.

66.     At the end of the July 12 meeting, John's parents urged Principal MacFarlane to take an interest in the matter given the dire consequences to their son. Principal MacFarlane

16

indicated that Exeter wished to consider all possible information and "get to the truth", and if Plaintiffs had additional information to be considered, to let her know.

67.     On July 18, 2016, John's parents sent a letter to Principal MacFarlane.  In this letter, they requested (again) a copy of the investigative report being relied upon by Exeter to evaluate the situation and discipline their son.  They expressed their frustration that Exeter was punishing John, a second time, for the same behavior for which he had been given a term's Dean's Leave.  Without the report they were hampered in their ability to identify information that the investigator had not considered, but they did identify relevant information that was among that they believed had not been requested, reviewed or considered at all, including additional witnesses who should be interviewed and communications (emails/text messages) that should be collected.[3]  A true and correct copy of the letter that was signed and sent to Principal MacFarlane is attached hereto as <u>Exhibit</u> <u>E</u>.

68.     John is aware that his friend and dorm mate sent an email in support of John to an Exeter administrator.  Thereafter, this student was interviewed by the investigator.  Exeter also reportedly spoke with Mr. Myers, although what was asked of or said by Mr. Myers is unknown.  Notwithstanding the emails that John had sent to Exeter, and any further facts that were uncovered, the investigator never sought to speak to John again.  Plaintiffs do not know whether the investigator was even shown the emails John sent to Dean Mischke.  John and Plaintiffs still are unaware of the scope of any additional investigation that may have been conducted or what evidence may have been gathered.  Neither John nor his Parents were ever given any investigative report, as was requested, at any time.

---

[3] Principal MacFarlane acknowledged receipt of this letter.  A true and correct copy of her response is attached hereto as <u>Exhibit</u> <u>J</u>.

69.     On August 16, 2016, Plaintiffs were notified that Principal MacFarlane was recommending that they voluntarily withdraw John from school, and failing that, he would be involuntarily withdrawn for engaging in sexual harassment of Jane, that is, sexual misconduct. No finding of sexual assault was ever made.  A true and correct copy of Principal MacFarlane's notice to John's parents is attached hereto as <u>Exhibit</u> <u>F</u>.

70.     The Exeter EBook is the student handbook which sets out, among other things, expectations regarding students' conduct as well as procedures Exeter will follow when investigating potential violations of the code of conduct and appropriate sanctions.  A true and correct copy of the Exeter EBook in effect at all pertinent times is attached hereto as <u>Exhibit</u> <u>G</u>.

71.     In any disciplinary matter where the Requirement to Withdraw, which is the discipline Exeter imposed on August 16, is a possible sanction, Exeter agreed to follow specific procedures in the EBook.  In such cases, for example, the accused "student and his or her adviser must appear before the Discipline Committee unless the student waives his or her right to appear before the committee by withdrawing from the Academy." *See* Ex. G (EBook) at p. 17.  The Discipline Committee is to be comprised of nine faculty members and four nonvoting student members.  *Id.* at pp. 17-18.  Written statements, including an accusing statement and the accused student's response, are read at a hearing before the Discipline Committee, and the student is allowed to present additional evidence and "hear all pertinent factual information presented to the committee." *Id.* at p. 18.  In sum, the EBook requires a process whereby the accused student is (a) notified of the accusations against him, (b) given an opportunity to respond and be heard before a committee, (c) aware of all evidence presented to the committee, and (d) subjected to discipline by the committee if the committee determines that a violation of the code of conduct has occurred.

4826-5507-1798, v. 1

72.     Exeter took no steps to follow this process.  Instead, John and Plaintiffs were led to believe Exeter viewed the interaction as an entirely consensual sexual interaction between two young people.  No one at Exeter notified John or Plaintiffs that sexual misconduct was being alleged by Jane, or what the nature of her statements about the interaction were, until *after* John was interviewed, the investigation was over, a report was delivered to Exeter only, and the sanction of a temporary Dean's Leave had been chosen by Exeter.  The decisions about guilt and sanction were made entirely in secret by Dean Mischke (and later, evidently, by Principal MacFarlane) without convening the Discipline Committee the EBook required and without disclosing the allegations made by Jane, what alleged rule violation Exeter was investigating, or what evidence Exeter was relying upon to reach its decisions.

73.     The EBook stated that if Exeter wished to keep open the possibility of imposing a sanction of a "Requirement to Withdraw", it had to follow formal procedures and convene a Discipline Committee.  Plaintiffs reasonably understood, from the EBook, the Dean's Leave letter, and Dean Mischke's statements, confirmed by comments made later by others at Exeter, that Exeter would not impose a permanent separation from school.  Plaintiffs understood John would be allowed to return if he met the conditions of leave.

74.     Exeter has violated Plaintiffs' and John's reasonable expectations by indicating it will not allow John to return for the fall term, notwithstanding that he has satisfied the conditions of the Dean's Leave.  Instead, Exeter has indicated it will impose a "Requirement to Withdraw" for the same underlying conduct that led to the Dean's Leave.  This is contrary to the reasonable expectations Exeter created in the EBook and Dean's Leave letter.

4826-5507-1798, v. 1

75.     Further, the second, ultimate sanction is also unfair where John made allegations that Jane had engaged in sexual misconduct in their interaction.  On information and belief, Exeter never investigated or disciplined Jane in any way.

76.     Exeter has been under fire in local media for its treatment of a different situation involving allegations by a female student that she was sexually harassed by another male student. Specifically, on July 13, 2016, *The Boston Globe* ran a story under the headline "Phillips Exeter Academy under fire again for its handling of sexual misconduct allegations".  This story ran just a day after Principal MacFarlane's meeting with Plaintiffs concerning John, and no doubt the *Globe* reporter had been in contact with administrators at Exeter about the story in between the time that Dean Coole told Father Doe, on May 26, 2016, that the Deans were looking forward to John's return, and the time that Exeter changed its mind and decided it should impose further discipline on John.

77.     The *Globe* story revealed that Exeter had completely mishandled allegations of sexual misconduct made by a female student against a male student.  The story was highly critical of the "discipline" Exeter imposed in that situation, which had the male student delivering bread regularly to the alleged female victim for the rest of that school year.  A true and correct copy of *The Boston Globe* story is attached hereto as <u>Exhibit H</u>.

78.     Exeter's decision to abandon the course to which it had committed itself—that is, a temporary Dean's Leave rather than the possibility of a Requirement to Withdraw and the disciplinary process this other course required—was no doubt impacted by *The Boston Globe* story and the fallout that followed.  Just a day after the first story was published, *The Boston Globe* reported, on July 14, 2016, that "[n]early 700 alumni of Phillips Exeter Academy in New Hampshire have signed a petition vowing to withhold donations to the elite boarding school until

20

leaders crack down on sexual abuse of students."  A true and correct copy of this story is attached hereto as Exhibit I.  One recent Exeter graduate was reported as stating that the July 13 story exposed the fact that the school's "senior administrative team lacks the training, empathy, and skill to address sexual misconduct on campus."  *Id.*

79.    The situation involving John highlights this ineptitude.  Under outside pressure to punish a male accused of sexual harassment and to protect a female accuser, Exeter has decided to impose a second, harsher punishment on John without any of the procedural protections Exeter promised would precede such a punishment.

80.    As a result of Exeter's decision to "revive" the sanction of Requirement to Withdraw, after already disciplining John, after John already met the requirements of the Dean's Leave, and after failing to afford John the procedures he is entitled to under the EBook in such a situation, it is now late August and John is being deprived of the opportunity to advance with his class year and continue his education at Exeter.  Indeed, at this late hour, it is virtually impossible for John to apply and be admitted to a school comparable to Exeter to continue his second year of high school.  John and his parents are scrambling to make suitable arrangements, but undoubtedly, John's academic career, not to mention his emotional and psychological well-being, are likely to suffer irreparable harm as a result of Exeter's conduct.

81.    Although Plaintiffs asked Principal MacFarlane to assist in seeking some suitable placement for John while they consider their options, Principal MacFarlane told them on August 18 that at this late date, other elite boarding schools likely have no spots available, and while she would provide what assistance she could, she thinks it unlikely a comparable school would be able to admit John for the fall term.  Indeed, based on Plaintiffs' prior experience, just completing application materials takes considerable time.  Given this communication with

Principal MacFarlane, even if another school were inclined to accept John for admission, Plaintiffs believe they will be unable to place John at a comparable school unless another second year male boarding student were to leave, with no prospect of imminent return, mid year.

<u>**Count I**</u>

<u>**Breach of Contract**</u>

82.     Plaintiffs refer to and incorporate each of the foregoing paragraphs as if fully restated herein.

83.     John Doe's relationship with Exeter is contractual in nature.  Pursuant to the agreement entered into by John Doe's parents on his behalf with Exeter, Exeter agreed to provide John Doe with, among other things, supervision, housing and academic instruction, while John Doe's parents agreed to pay John Doe's tuition.  Among the promises Exeter made to Plaintiffs and John was to comply with the provisions of the Exeter EBook, Exeter's student handbook, which outlined conduct requirements and responses Exeter could take in situations where a student's conduct did not comply with those requirements.

84.     The EBook expressly provided that in all disciplinary matters where a "Requirement to Withdraw", the highest possible penalty, was a possibility, EBook would follow procedures specified therein.  Those procedures required that a statement setting out the accusation be given to the student, the student provide a written response, and a Discipline Committee be convened to hear evidence and decide whether a violation had occurred and the appropriate level of discipline.

85.     Alternatively, the EBook authorizes the Deans to impose a discretionary, and temporary, Dean's Leave for virtually any reason.  The EBook provides no mechanism for a Dean to impose a "permanent" Dean's Leave, or for the Dean's Leave to act as a substitute for

4826-5507-1798, v. 1

the Requirement to Withdraw.  The EBook provides no procedural protections for a student where a temporary Dean's Leave is a possibility.

86.     Exeter chose to deal with this situation through the "Dean's Leave" process, thus deciding that a "Requirement to Withdraw" was _not_ a possible sanction that it could or would impose here.

87.     Exeter disciplined John by requiring him to accept a Dean's Leave for the spring term of 2016 and imposing conditions.  The Dean's Leave letter and Dean Mischke both represented to Plaintiffs and John that Exeter would review only John's compliance with the conditions of his leave in evaluating his return and advancement in the fall term.

88.     John met the conditions of his Dean's Leave, and Exeter has never contended otherwise.  Based on communications from Dean Coole and others, Plaintiffs fully expected John would be allowed to return in the fall.

89.     However, Exeter is now seeking to impose a "Requirement to Withdraw".  This is a breach of Plaintiffs' and John's contractual rights.

90.     Exeter cannot now pursue a "Requirement to Withdraw" process because it already chose, instead, to impose a Dean's Leave.  John has complied.  Exeter's refusal to allow John to attend classes this fall term is a breach of contract.

91.     John and his Parents, by contrast, have done everything required of them to comply with the conditions of the Dean's Leave and to prepare John for return to school in the fall.  Indeed, Plaintiffs have, for example, responded to Exeter's request over the summer for updated medical information in anticipation of John's return to school and continued to receive routine communications, including from the Principal's office, in anticipation of his return.

92.     As a result of Exeter's breach of contract, John and his parents have suffered substantial harm, including irreparable harm in the form of destruction of John's reputation and relationships and interruption of his high school career.  At this late date, John's parents believe it impossible to get him into a school comparable to Exeter, which will advance him to 10th grade, given that many schools have already begun their fall terms and the application process for a school like Exeter is typically quite long and rigorous.  Public school in John's home state has already begun.

## Count II

### Breach of Implied Covenant of Good Faith and Fair Dealing

93.     Plaintiffs refer to and incorporate each of the foregoing paragraphs as if fully restated herein.

94.     The Dean's Leave letter created an enforceable obligation on the part of Exeter and Plaintiffs to comply with its terms.  Although it reserved to Exeter some discretion, Exeter represented, in writing and orally, that it would confine exercise of its discretion in reviewing only John's compliance with the conditions of the leave to determine his status in the fall term. Exeter further stated the parties' mutual expectation that Plaintiffs wished for their son to return to Exeter in the fall and advance to 10th grade with his peers.

95.     Exeter violated its obligations under the implied covenant of good faith and fair dealing/obligation of good faith performance when it did not confine its discretion and review only John's compliance with the conditions of his leave.  Instead, Exeter has stated its intention to impose additional discipline, a "Requirement to Withdraw", based on the same underlying conduct upon which it relied to impose a Dean's Leave.

4826-5507-1798, v. 1

96.     John has suffered harm due to Exeter's violations of its obligations under the implied covenant of good faith and fair dealing/obligation of good faith performance, and he will suffer irreparable harm without preliminary injunctive relief.

## Count III

## 20 U.S.C. § 1681 (Title IX)

97.     Plaintiffs refer to and incorporate each of the foregoing paragraphs as if fully restated herein.

98.     Title IX of the Education Amendments of 1972 apply to private schools that receive federal funding, like, on information and belief, Exeter.  Pursuant to Title IX of the Education Amendments of 1972, John has a right not to be subjected to discipline where sex is a motivating factor in the decision to enforce the EBook's code of conduct and, in general, to be treated fairly by Exeter without regard to John's sex.

99.     Title IX requires that federally funded schools adopt and follow grievance procedures that provide for "prompt and equitable" resolution of Title IX complaints.  *See* 34 CFR §106.8(b).  The U.S. Department of Education advised Exeter and other educational institutions in at least April 2011 that their "prompt and equitable" procedures must provide, at a minimum, certain protections, including "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence." The Department also advised that throughout an investigation, including at the hearing, "the parties must have an equal opportunity to present relevant witnesses and other evidence."  The complainant and accused must be given "similar and timely access to any information" that will be part of the hearing/decision-making process.

4826-5507-1798, v. 1

100.    As described above, Exeter violated John's rights to fair treatment under Title IX, resulting in both an erroneous outcome and selective enforcement of John's rights under the EBook.

101.    Exeter selectively enforced its code of conduct and disciplinary procedures.  In a situation where John stated that Jane had pursued him, pressured him and engaged in sexual contact with him without his consent, John was investigated and given a Dean's Leave, and now stands subject to a Requirement to Withdraw, while Jane's studies at Exeter have continued uninterrupted.  She was even transferred to a highly desirable, single dormitory unit, on information and belief, at her request.  Furthermore, Exeter has not afforded John any of the procedural protections afforded to him under the EBook or under applicable Title IX guidance for situations where permanent separation from school is a possible sanction.

102.    Additionally, Exeter has concluded that Jane's story (apparently) is true, while John's version of events is false.  This in spite of the fact that numerous students, friends of both Jane and John, have reported to Exeter that Jane has changed her story over time, and in spite of the deans' acknowledgment to John and Plaintiffs that when Jane first spoke to the deans, she admitted the entire interaction was consensual on her part.

103.    Exeter's treatment of John was motivated by gender bias, including the belief that male students cannot be pressured into unwelcome sexual contact and/or always consent to sexual contact from female students.  Furthermore, Exeter wanted to discipline a male accused of sexual harassment of a female student in response to pressure as a result of, among other negative media attention, *The Boston Globe* stories discussed herein.

104.    Exeter has failed to remediate its discriminatory conduct directed at John.

4826-5507-1798, v. 1

105.     As a result of the foregoing, John has been harmed by Exeter, including having his academic studies interrupted and the high likelihood that he will be unable to continue his studies this fall at Exeter or at another school comparable to Exeter.

### Count IV

### Estoppel

106.     Plaintiffs refer to and incorporate each of the foregoing paragraphs as if fully restated herein.

107.     Dean Mischke orally represented to Plaintiffs that Exeter was imposing a one term Dean's Leave in the spring of 2016, and that if John met the conditions of leave, he would be back at Exeter in the fall.  Dean Mischke threatened Plaintiffs that if they did not accept the one semester's Dean's Leave, she would make it a permanent leave.  Plaintiffs felt they had no choice but to comply with the leave conditions, and they believed that if they did, Dean Mischke's representations that the leave would not become permanent would be upheld by Exeter.  The Dean's Leave letter they received, as stated herein, confirmed their agreement and expectations that if John accepted the leave and performed its conditions, he could return to school.

108.     Exeter knew that by making these promises and sending the Dean's Leave letter these representations were likely to induce reliance thereon by John and his parents.

109.     In fact, Plaintiffs reasonably relied on these oral and written representations by assisting John in performing the conditions of his leave and not seeking to apply for his admission to another elite boarding school for the fall as set out herein and in refraining from challenging, until now, the finding Exeter had made and its decision to discipline John with a temporary leave.

4826-5507-1798, v. 1

110.     Plaintiffs and John performed by completing the conditions of the leave and making the requisite submissions to Exeter, which Exeter accepted.

111.     Exeter should be estopped from reneging on its promise or acting contrary to its prior course of conduct and representations, upon which Plaintiffs relied to their detriment.

112.     By virtue of Exeter's stated intention to breach its promises and act contrary to its prior course of conduct in imposing the Dean's Leave with conditions which have been met, John is likely to suffer irreparable harm as set out herein and other damage.

## Count V

## Negligent Infliction of Emotional Distress

113.     Plaintiffs refer to and incorporate each of the foregoing paragraphs as if fully restated herein.

114.     Exeter owed a duty of care to John and Plaintiffs, including that it would fairly impose discipline without doing so in an arbitrary or discriminatory manner and only in accordance with its representations and policies and procedures.

115.     Exeter acted negligently in this matter as set out herein.  In particular, to the extent that Exeter intended to reserve the possibility of additional discipline, in particular a Requirement to Withdraw, for John's conduct, it breached its duty to John and his parents in how it handled notification of the Dean's Leave and in how it investigated the matter.

116.     As a direct and foreseeable consequence of Exeter's negligence, John has suffered and continues to suffer substantial damages, including a strong likelihood of irreparable harm, in the form of irreparable interruption in his academic pursuits, emotional and psychological distress with physical manifestations including nightmares, restless sleep and anxiety among others, loss of educational opportunities, and other harm and damages.

28

<u>**Count VI**</u>

<u>**Injunctive Relief**</u>

117.    Plaintiffs refer to and incorporate each of the foregoing paragraphs as if fully restated herein.

118.    As set out above, Plaintiffs are likely to prevail on their claims against Exeter.

119.    The process by which Exeter now seeks to impose a second punishment, a Requirement to Withdraw, on John was fundamentally flawed.  Exeter must be held to its decision to pursue a Dean's Leave sanction instead of retaining the option of imposing a Requirement to Withdraw, and indeed Exeter has completely failed to meet any of the procedural requirements for a disciplinary process where a Requirement to Withdraw could be a sanction.

120.    Exeter has indicated its intention to remove John as an enrolled student and compel him to withdraw from the school, notwithstanding that John complied with the conditions of his Dean's Leave, Exeter's promises to John and his parents that he could return under these circumstances, and its complete failure to afford John basic fairness or to adhere to the procedures in the EBook which are prerequisites to such a sanction.

121.    It took John and his parents approximately a year to complete the application process at Exeter and get him accepted to this highly selective school.  There are only a handful of comparable schools in the country, and given that John's parents were only informed of Exeter's decision on August 16, it is highly unlikely that they will be able to make arrangements for him to apply to, get accepted at, and enroll in a school of comparable quality in time to commence the fall term anywhere else.  As set out herein, Plaintiffs have been told by Principal MacFarlane and Dean Cosgrove that it is unlikely other elite boarding schools would even have space for John at this time.  Thus, John stands likely to suffer irreparable harm in the form of

29

interruption in his academic course of study at a highly selective and elite boarding school where he had been performing quite well. Injunctive relief at the end of trial will not adequately remediate this harm, because by that time John will have missed several terms of school and be well behind his peers even if he ultimately is able to return to Exeter and his education and ability to achieve academically will be permanently harmed. Furthermore, John is likely to suffer irreparable emotional and psychological harm if he is branded a sexual assailant and severed from the school under the circumstances present here.

122.    Exeter should be enjoined, preliminary and permanently, from withdrawing John from the school and otherwise interfering in his ability to remain enrolled and fully participate in the academic and social life at Exeter based on the interaction between John and Jane that occurred in January 2016, for which John has already been punished.

**WHEREFORE**, Plaintiffs Father Doe and Mother Doe respectfully request that the Court grant them the following relief:

1.    Enter the requested preliminary and permanent injunction against Exeter;

2.    After trial, enter judgment for the Plaintiffs on each Count of the complaint and award them damages in an amount determined at trial, including attorney's fees, costs and interest as applicable; and

3.    Grant such other relief as the Court deems just and equitable.

## <u>JURY DEMAND</u>

Plaintiffs Father Doe and Mother Doe hereby demand a trial by jury on all claims so triable.

Respectfully submitted,

FATHER DOE and MOTHER DOE,

By their attorneys,

Dated: August 30, 2016

/s/ Samantha D. Elliott
Samantha D. Elliott (NH #17685)
elliott@gcglaw.com
GALLAGHER, CALLAHAN &
GARTRELL, P.C.
214 N. Main Street
Concord, NH 03301
Tel. (603) 228-1181
Fax (603) 224-7588

Dated: August 30, 2016

/s/ Megan C. Deluhery
Megan C. Deluhery (MA BBO #655564)
*Pro hac vice application pending*
mdeluhery@toddweld.com
TODD & WELD LLP
One Federal St., 27th Floor
Boston, MA 01880
Tel. (617) 720-2626
Fax (617) 227-5777

4826-5507-1798, v. 1