UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| FATHER DOE and MOTHER DOE, | ) | |
| As parents and next friends of JOHN DOE | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | DOCKET NO. 1:16-cv-00396-JL |
| | ) | |
| PHILLIPS EXETER ACADEMY, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S PROPOSED FINDINGS OF FACT AND RULINGS OF LAW

In accordance with this Court's Procedural Order of September 1, 2016 [Docket No. 8], Defendant Phillips Exeter Academy hereby submits the following Proposed Findings of Fact and Rulings of Law regarding the Plaintiffs' Motion for Preliminary Injunction.

### Findings of Fact

1.     Defendant Phillips Exeter Academy ("PEA") presently receives no federal funding and no financial assistance of any kind from the federal government, and did not receive federal funding or financial assistance from the federal government during the 2015/2016 school year.

2.     On the evening of February 21, 2016, a fifteen-year-old female student at PEA, "Jane Roe" or "Jane," informed a counselor at PEA's Health Center that, roughly three weeks earlier, she had a sexual encounter with a fifteen-year-old male student, "John Doe" or "John," the son of the plaintiffs in this case.

3.     Jane described the details of the sexual encounter for the counselor, and stated that she was unsure whether the encounter was rape or sexual assault, but that it was uncomfortable for her and what happened was not okay.

1

4.      Because John and Jane were both minors under the legal age of consent, PEA reported Jane Doe's statements to both the New Hampshire Department of Children, Youth & Families ("DCYF") and the Exeter Police Department the next morning, February 22, 2016.

5.      PEA's student handbook for the 2015/2016 school year, "The E Book," explains that "[u]pon learning of a possible sexual assault, the Academy is required, once permitted by local law enforcement, to conduct its own investigation in order to ensure the safety and security of the entire campus community."  The E Book at 72.

6.      As envisioned by The E Book, in addition to reporting Jane Doe's statements to DCYF and the police, PEA initiated its own investigation to determine what had happened, so that it could make a decision as to how to handle the situation that would take into account the safety and well-being of the students involved.

7.      Before undertaking its investigation, PEA's Dean of Students, Melissa Mischke met with John Doe and his faculty adviser, Alex Myers, in her office on February 22, 2016, to inform John that PEA had made a report of a possible sexual assault to DCYF and the police and that PEA would be conducting its own investigation.

8.      During the February 22, 2016 meeting, John Doe admitting having had a sexual encounter with Jane, and volunteered that the encounter was consensual.

9.      During the February 22, 2016 meeting, Dean Mischke neither asked John whether the encounter was consensual nor assured him that PEA intended to treat it as a case of underage consensual sexual activity.

10.      On February 22, 2016, Dean Mischke also called John Doe's father to inform him that there would be an investigation into John Doe's encounter with Jane Doe.

2

11.     John Doe's mother also participated in Dean Mischke's February 22, 2016 call regarding the investigation.

12.     Mr. and Mrs. Doe were aware, at the time of their February 22, 2016 call with Dean Mischke, that there was a question as to whether John Doe's encounter with Jane Roe was consensual, as Mr. Doe relayed to Dean Mischke his "sense" that the incident was consensual.

13.     Dean Mischke did not assure the Does on the February 22, 2016 call that she believed the incident to be consensual.

14.     PEA's ordinary disciplinary process is set forth in The E Book.  This process can entail convening a Discipline Committee composed of faculty and students.  The E Book at 17-18.

15.     The E Book also describes what is called "Dean's Leave"; providing that "[a] dean may for any reason he or she deems appropriate require a student to reside in the Health and Wellness Center or to leave campus temporarily; remove a student from a dormitory; or order that the student not enter upon the premises of the Academy and require the student to return home.  The length and conditions of the Dean's Leave will be set by the dean of students."  The E Book at 19.

16.     The first page of text in The E Book, titled "Welcome to Exeter," explains that "[t]he rules and procedures outlined in this handbook apply under normal circumstances. However, from time to time there are situations that require immediate, nonstandard responses. In such circumstances, the Academy reserves the right to take actions deemed to be in the best interest of the Academy, its faculty and its students.  This document as written does not limit the authority of the Academy to alter its rules and procedures to suit any unusual or changed circumstances."  The E Book at 5.

17.     PEA's Deans and Principal concluded that John Doe's case was the type of "unusual circumstance" requiring an "immediate, nonstandard response" envisioned by The E Book.

18.     In determining that a nonstandard response was warranted, the Deans and Principal hoped to protect the privacy and emotional well-being of both John Doe and Jane Roe, which they believed could be compromised by the airing of extremely personal, sensitive, and potentially embarrassing information in the context of a Discipline Committee process that necessarily involves other students and faculty.

19.     In addition, because the focus of the ordinary disciplinary process is the appropriate punishment and rehabilitation of the accused, that process does not contemplate giving voice to a victim and his or her best interests.  As a result, PEA's Deans and Principal believed that the ordinary disciplinary process was inappropriate for John Doe's case, which involved a potential victim in Jane Roe.

20.     For the foregoing reasons, PEA's Deans and Principal, working in coordination, removed John Doe's case from the ordinary disciplinary process.

21.     The removal of John Doe's case from the ordinary disciplinary process is consistent with PEA's practice in cases involving serious sexual misconduct, including cases of sexual assault and egregious sexual harassment.

22.     In cases involving serious sexual misconduct, PEA's practice is to retain an independent external investigator who interviews witnesses, reviews relevant documents, and then issues a report with factual findings and conclusions regarding whether any PEA polices were violated.  The Dean of Students, in consultation with the deans on her team, then makes a

recommendation to the Principal, who makes a final decision on an appropriate disposition of the case.

23.     In John Doe's case, PEA retained a trained and experienced sexual misconduct investigator, attorney Kai McGintee, to investigate Jane Doe's report.

24.     On February 24, 2016, Dean Mischke sent an email to both Mr. and Mrs. Doe informing them that PEA had hired Ms. McGintee to conduct an investigation, and that Ms. McGintee was planning to interview John on February 26, 2016.  Dean Mischke invited Mr. and Mrs. Doe to contact her to discuss the plan for the investigation, and offered to make arrangements for them to speak directly with Ms. McGintee.

25.     Ms. McGintee interviewed Jane Roe on February 26, 2016.

26.     Ms. McGintee interviewed John Doe on February 26, 2016.

27.     John Doe's faculty adviser, Alex Myers, attended John's February 26, 2016 interview for the sole reason of providing support to John.

28.     Prior to John Doe's February 26, 2016 interview, Mr. Myers explained to John that he did not have to answer the investigator's questions if he did not want to, but that he could face negative consequences if he refused to answer or cooperate with the investigation.

29.     John Doe brought a prepared written statement with him to the interview.  Before Ms. McGintee asked John any questions, she permitted him to read his statement.  Throughout the interview, Ms. McGintee listened to what John said and took notes.

30.     Mr. Myers found Ms. McGintee's questions to John Doe to be clear and precise, not designed to trick or trap John in any way, and not biased in favor of Jane Doe.  Mr. Myers believes that Ms. McGintee was fair and impartial in her treatment of John and did not prejudge his case.

5

31.     John did not raise with the Dean of Students, or any other PEA administrator, any concerns about the fairness and impartiality of Ms. McGintee's interview of him until more than one week later, after he had returned home for spring recess.

32.     In addition to speaking to Jane Roe and John Doe, Ms. McGintee also interviewed one student who had conversations with both John and Jane about their encounter, and reviewed relevant documents, including text messages between the aforementioned student and Jane that related to Jane's encounter with John.

33.     On Thursday, March 3, 2016, Ms. McGintee reported her findings and conclusions to PEA.  Ms. McGintee concluded that John Doe had violated PEA's sexual misconduct and sexual harassment policies because he had (a) penetrated Jane Roe, a minor under the age of legal consent, multiple times, (b) penetrated Jane without obtaining clear affirmative factual consent on at least two occasions (once digitally and once with his penis), and (c) although he stopped penetrating Jane each time she asked, he continued to pressure her to engage in sexual activity despite her signals that she wanted it to stop.

34.     Ms. McGintee's findings were based in part upon John Doe's own admissions, during his interview, that he did not have any discussion with Jane Roe about digital penetration before he did so, and he did not think he needed to ask her because her pants were off and he thought it was just part of hooking up.

35.     John Doe completed PEA's winter term on Friday, March 4, 2016, and returned home.

36.     Between March 4 and March 6, 2016, Dean Mischke discussed John Doe's case with the other deans, other administrators in the Principal's Office, including PEA Principal Lisa MacFarlane, PEA's legal counsel, and health professionals from the Academy's Health Center.

37.    Dean Mischke and the other deans determined that it would be in the best interests of both students to pause the case and keep John Doe home on a Dean's Leave for the spring term.  Principal MacFarlane approved this course of action.

38.    The Dean's Leave was not intended as punishment for John Doe, but as an interim measure to give Jane Roe an opportunity to finish the academic school year while obtaining counseling and therapy at PEA, give John Doe an opportunity to reflect on what had happened and obtain counseling and support at home, and give the administration more time to determine whether John Doe could be permitted to return to PEA.

39.    On March 7, 2016, Dean Mischke spoke to Mr. and Mrs. Doe by phone, and informed them that PEA had decided to place John on a Dean's Leave for the spring term.

40.    In her March 7, 2016 telephone conversation with Mr. and Mrs. Doe, Dean Mischke informed the Does that John Doe would be on Dean's Leave for the spring term, and that PEA would decide whether John could return for the fall term after graduation.  Dean Mischke did not make any promise or guarantee that John would be permitted to return.

41.    On March 7, 8, and 20, 2016, John Doe sent Dean Mischke emails asking for reconsideration of the decision to place him on Dean's Leave.  In his emails, John challenged the fairness of the investigation, claimed that Ms. McGintee had asked biased questions and prejudged the case, and provided Dean Mischke with his version of the events that had transpired with Jane Roe.

42.    Dean Mischke spoke with Mr. and Mrs. Doe via telephone for over one hour on March 18, 2016.

43.     On March 23, 2016, Dean Mischke sent the Does a letter (dated March 21, 2016) that explained the deans' decision to place John Doe on Dean's Leave and confirmed that although the Deans had reviewed John's email submissions, their decision remained unchanged.

44.     Dean Mischke's letter dated March 21, 2016 stated that the deans would review John Doe's case in June "to determine whether or not he is permitted to return to the school next fall," and that they would consult with Connie Morse of PEA's Clinical and Psychological Services group "to consider [John's] return next year."  The letter did not promise that John would be permitted to return the following school year.

45.     In April, faculty adviser Alex Myers spoke to Mrs. Doe about the disposition of John Doe's personal belongings.  Although Mr. Myers stated that others in the advisory missed him and hoped that he would come back, he did not tell Mrs. Doe that John would be returning to PEA in the fall.

46.     In accordance with Dean Mischke's letter dated March 21, 2016, in June 2016, PEA's deans, administrators, clinicians, and legal counsel reviewed John Doe's case to determine whether John would be permitted to return to PEA.

47.     Based upon a variety of factors, including Ms. McGintee's findings that John Doe had sexually penetrated Jane Roe without obtaining affirmative consent and had sexually harassed her by continuing to cajole her for further sex acts after she had signaled that she wanted to stop; John's own admissions that  had sexually penetrated Jane Roe; concern that Jane Roe's safety and psychological well-being would be compromised if John Doe were permitted to return to campus; and concerns that John Doe would face student criticism and hostility if he returned to campus, the deans recommended to Principal MacFarlane that John Doe not be allowed to return to PEA.

48.     As the Principal of PEA and the head of its administration, Principal MacFarlane was not bound by the deans' recommendation, but was responsible for making her own final decision regarding whether John Doe should return to PEA.

49.     After reviewing the matter in its entirety, including Ms. McGintee's report, the deans' recommendation, and correspondence PEA had received from John Doe and his parents, and consulting with other administrators and PEA's legal counsel, Principal MacFarlane determined that it would be in the best interest of all parties involved for John Doe to be withdrawn from PEA.

50.     Principal MacFarlane reached her decision based upon evidence supporting a conclusion that John Doe had violated PEA's sexual harassment policies, concerns that John Doe may have committed a criminal sexual assault under New Hampshire law, the impact of John Doe's conduct on Jane Roe, and concern for John Doe's own well-being.

51.     Because Principal MacFarlane's decision to withdraw John Doe was not primarily intended to punish him for his actions, she chose not to sanction John Doe with a "Requirement to Withdraw," which may be imposed through the ordinary disciplinary process in cases of egregious misconduct and is noted by name on a student's transcript.  Rather, she chose to "Withdraw" John Doe from PEA, which, while it will also be noted on his transcript, does not carry the same negative connotations as a "Requirement to Withdraw."

52.     On June 22, 2016, Dean Mischke called Father Doe and communicated PEA's final decision to withdraw John Doe.

53.     At Mr. and Mrs. Doe's request, Principal MacFarlane and Dean Mischke met with them on July 12, 2016.

9

54.     During the July 12, 2016 meeting, Mr. and Mrs. Doe expressed their displeasure with PEA's decision to withdraw John, and complained that the process by which that decision had been reached was unfair.

55.     At the conclusion of July 12, 2016 meeting, Principal MacFarlane invited the Does to provide any additional information that they believed she should have considered in reaching a decision.

56.     On July 17, 2016, Mr. and Mrs. Doe sent Principal MacFarlane a letter again outlining their disagreement with the outcome and identifying additional information for her consideration.

57.     Principal MacFarlane agreed to investigate the Does' concerns.  PEA again retained Ms. McGintee to interview further student witnesses identified by the Does and to collect additional information.  Principal MacFarlane also instructed PEA's attorneys to interview Alex Myers to determine whether Ms. McGintee's interview of John Doe had been fair and impartial.

58.     On August 15, 2016, the deans met to determine whether they should revise their recommendation to Principal MacFarlane in light of the additional information generated in response to the Does' requests.  The deans reported to Principal MacFarlane that they were in agreement that she should uphold her decision to withdraw John Doe.

59.     After receiving the deans' recommendation, Principal MacFarlane again reviewed the entire matter and agreed that the additional information did not change or alter the decision she had originally reached in June.  Principal MacFarlane informed the Does of that determination via email on August 16, 2016.

60.     John Doe was "withdrawn" from PEA on August 18, 2016.  Although John's transcript from PEA will reflect his withdrawal, it will not reflect that his withdrawal was involuntary, and PEA does not intend to inform other schools of the circumstances of John's withdrawal without the Does' express written consent.

61.     John Doe is currently enrolled in a public high school in his home state.

62.     PEA's academic year is comprised of three semesters or terms—fall, winter, and spring.  From time to time, PEA students will take medical leaves of absence. When a student takes a medical leave of absence, PEA works to accommodate them upon their return so that they may still graduate on time.  PEA's medical leave policy enables a student to be on leave from the Academy for up to three terms.  Upon the student's return, and as part of the reintegration process, PEA evaluates any necessary academic accommodations and adjustments to the student's graduation requirements.

63.     If this case is tried expeditiously and resolved in John Doe's favor, John Doe will be able to return to PEA having missed only two or three terms in total—no more than is permitted of students on medical leave.

64.     There is no competent evidence that John Doe will suffer any harm to his college admission prospects if he is not readmitted to PEA for the fall 2016 term.

### Rulings of Law

1.     The Plaintiffs, as the moving parties, bear the burden of establishing their entitlement to a preliminary injunction.  *Esso Std. Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).  The Plaintiffs have not carried their burden.

2.     To establish their entitlement to preliminary injunctive relief, the Plaintiffs must establish (1) a likelihood of success on the merits, (2) a likelihood that they will suffer

irreparable harm in the absence of preliminary relief, (3) the balance of the equities tip in their

favor, and (4) the injunction is in the public interest. *Peoples Fed. Sav. Bank v. People's United*

*Bank*, 672 F.3d 1, 9 (1st Cir. 2012). The first two factors carry the most weight in this analysis.

*Braintree Labs, Inc. v. Citigroup Global Mkts, Inc.* 622 F.3d 36, 41 (1st Cir. 2010).

3.       The Plaintiffs have not established a likelihood that they will succeed on the

merits of their claims.

4.       Because PEA is not a recipient of federal financial assistance, and was not a

recipient of federal financial assistance during the 2015/2016 school year, it is not subject to the

strictures of Title IX. *See*, *e.g.*, *Doe v. Oyster River Co-op. Sch. Dist.*, 992 F. Supp. 467, 479

(D.N.H. 1997) (to state claim under Title IX, plaintiff must prove that s/he was a student "in an

educational program or activity receiving federal financial assistance within the coverage of Title

IX"). Plaintiffs are therefore unlikely to succeed on their Title IX claim.

5.       Plaintiffs also are not likely to prevail on their claims for breach of contract,

breach of the implied covenant of good faith and fair dealing, and estoppel.

6.       Insofar as the Plaintiffs' claims rely upon the allegation that PEA promised them,

in oral or written communications, that John Doe could return to PEA for the fall 2016 term if he

complied with the conditions of his Dean's Leave, that allegation is not supported by the

evidence. It is expressly contradicted by the language of Dean Mischke's letter dated March 21,

2016, which did not promise that John would be permitted to return the following school year if

he complied with the conditions of his Dean's Leave, but stated that the deans would review

John Doe's case in June "to determine whether or not he is permitted to return to the school next

fall," and that they would consult with Connie Morse of PEA's Clinical and Psychological

Services group "to consider [John's] return next year."

7.      Any expectation that the Plaintiffs had that John Doe would be permitted to return to PEA if he complied with the conditions of his Dean's Leave was not reasonable.

8.      Insofar as the Plaintiffs' claims rely upon the proposition that The E Book requires PEA to make a choice between Dean's Leave and the Discipline Committee process in dealing with disciplinary matters, so that once PEA had decided to place John Doe on Dean's Leave it was prohibited from taking further disciplinary action, that proposition is also unsupported.  Accepting Plaintiffs' claim that The E Book set forth the relevant terms of the parties' contractual relationship, nothing in The E Book states or suggests that the placement of a student on Dean's Leave terminates the disciplinary process or precludes further disciplinary action.

9.      Insofar as the Plaintiffs' claims rest upon the proposition that The E Book did not permit PEA to deviate from the ordinary disciplinary process identified therein, that proposition is also unsupported.  The E Book expressly permits PEA "to alter its rules and procedures to suit any unusual or changed circumstances" in the event of "situations that require immediate, nonstandard responses."  This provision vests discretion in PEA to remove cases from the ordinary disciplinary process when necessary, so that the Plaintiffs could have had no expectation that the ordinary disciplinary process would be followed in John Doe's case.

10.      Finally, insofar as Plaintiffs claim that PEA exercised its discretion to remove John Doe's case from the ordinary disciplinary process in an unreasonable manner, they are not likely to succeed under that theory either.  PEA reasonably believed, for the reasons set forth in the declarations of Dean Mischke and Principal MacFarlane, that the ordinary disciplinary process was not suited to address a case in which one student had accused another of sexual

misconduct.  The process PEA adopted to investigate the accusation and arrive at a disciplinary sanction was reasonable.

11.     That Plaintiffs are not satisfied with PEA's conclusion resulting from that process does not prove the process was unfair.  The Court cannot retry or second-guess PEA's conclusion.  *See*, *e.g*, *Davis as Next Friend of Loshanda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999);  *Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 13 (D. Me. 2008).

12.     Although the Plaintiffs assert, in a footnote to their memorandum, that they "are also likely to prevail on their other common law claims," they have presented no developed argument in support of that assertion.  They therefore have not established a likelihood of success on those claims.

13.     Plaintiffs also have not established that they will suffer irreparable harm if the requested relief is denied.

14.     John Doe is not being denied an education as a result of PEA's decision to withdraw him.  He is attending high school in his home state.

15.     Plaintiffs' assertion that John's academic career in high school and beyond will be "irreparably derailed" if the requested injunction is not granted is highly speculative, and is unsubstantiated by any competent and reliable evidence.  *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 19 (1st Cir. 1996) ("the plaintiff's showing [of irreparable harm] must possess some substance; a preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm").  This lawsuit is capable of being resolved within a year, and if it is resolved in Plaintiffs' favor, John will be able to reenroll at PEA well in advance of his anticipated graduation date.

16.     Finally, the balance of the equities and the public interest weigh in favor of denying the requested relief.  The evidence supports the conclusion that PEA made a difficult, but principled, determination that John had violated its sexual misconduct/harassment policies. Both PEA and the public have an interest in the continuing safety and well-being of PEA's student body—including Jane Roe, who remains a student at PEA—and there is reason to believe that interest would not be served by John Doe's return to campus at this time.

Dated: September 7, 2016                    Respectfully submitted,

                                            COUNSEL FOR THE DEFENDANT:

                                            **PHILLIPS EXETER ACADEMY**


                                            */s/  W. Daniel Deane*
                                            W. Daniel Deane, Esq. (Bar #18700)
                                            **NIXON PEABODY LLP**
                                            900 Elm Street, 14th Floor
                                            Manchester, NH 03101
                                            T:  (603) 628-4000
                                            F:  (603) 628-4040
                                            ddeane@nixonpeabody.com

                                            Steven M. Richard
                                            Admitted *Pro Hac Vice*
                                            **NIXON PEABODY LLP**
                                            One Citizens Plaza, Suite 500
                                            Providence, RI  02903
                                            T:  (401) 454-1020
                                            F:  (401) 454-1030
                                            srichard@nixonpeabody.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of September, 2106, I caused a true and accurate copy of this *Defendant's Proposed Findings of Fact and Rulings of Law* to be served on all counsel of record *via* the Court's CM/ECF system.


*/s/ W. Daniel Deane*
W. Daniel Deane, Esq.